**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| **J.F.,** | : | **CIVIL ACTION** | |
| **Plaintiff,** | : | | |
| | : | | |
| **vs.** | : | **NO.    25-cv-280** | |
| | : | | |
| **FRANK BISIGNANO,** | : | | |
| **Commissioner of Social Security,** | : | | |
| **Defendant.** | : | | |

**<u>MEMORANDUM OPINION</u>**

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                                **November 26, 2025**

Plaintiff J.F., through his mother Tysheena F., filed this action pursuant to 42 U.S.C. § 405(g) seeking review of the Commissioner of the Social Security Administration's decision denying his claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. This matter is before me for disposition upon consent of the parties. For the reasons set forth below, Plaintiff's Request for Review is **GRANTED**, and the matter is remanded for further proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed an application for SSI on March 8, 2021, alleging disability beginning on January 1, 2019. (R. 19). Plaintiff's application was denied at the initial level on December 29, 2021, and upon reconsideration on November 10, 2022, and she requested a hearing before an Administrative Law Judge (ALJ). (R. 83-86, 97-102). The hearing occurred on January 19, 2024. (R. 32-60). Tysheena F. testified at the hearing, with counsel for Plaintiff also in attendance. (*Id.*). On March 6, 2024, the ALJ issued a decision denying benefits under

the Act.  (R. 16-31).  Plaintiff requested review of the decision, and the Appeals Council denied his request on November 8, 2024.  (R. 3-8, 166-68).

Plaintiff filed a Complaint in this Court on January 16, 2025.  (Compl., ECF No. 1).  On February 6, 2025, Plaintiff consented to my jurisdiction in this matter.  (Consent, ECF No. 4). On September 2, 2025, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 16).  On September 15, 2025, the Commissioner filed a response (Resp., ECF No. 17), and, on September 29, 2025, Plaintiff filed a reply brief.  (Reply, ECF No. 18).

## II.    FACTUAL BACKGROUND

The Court has reviewed the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.  Plaintiff was born on August 22, 2012, making him eight years old on the date the application was filed.  (R. 177).

### A.    School Records

A February 24, 2020 standardized cognitive assessment determined that Plaintiff's "overall ability is within the Borderline to Low Average Range when compared with his peers," and he has had Individualized Education Plans (IEPs) since at least December 9, 2020.  (R. 264, 437-60; *see also* R. 461-571).  In his most recent IEP in the record, covering September 21, 2023, through February 14, 2024,[1] it was noted that Plaintiff receives math and English co-teaching for 10 minutes each thrice weekly in the regular classroom and special education services for reading, writing, academic skills, and social/emotional skills for 20 to 50 minutes

---

[1]  The record also includes an IEP covering February 13, 2024, through February 12, 2025, but it is stamped "Proposed" throughout the document.  (R. 555-71).  This proposed IEP notes that Plaintiff is in sixth grade but performs at a third-grade level.  (R. 555, 561).

one to four times per week.  (R. 547).  He received general education in art, computer skills, health, music, physical education, science and social studies and both regular and special education in English language arts, math, and writing.[2]  (R. 547-51).  Accommodations and modifications common to both settings included frequent breaks, provision of an assignment checklist, reduced assignments (60 percent of peers' requirement), repeated directions, and specialized testing (in a separate room, one-on-one and/or read-aloud).  (*Id.*).

### B.    Medical Records

On January 7, 2019, Shane Eynon, Ph.D., performed a Comprehensive Biopsychosocial Evaluation of Plaintiff for possible diagnosis of autism spectrum disorder.  (R. 736-49). Plaintiff's parents reported to Dr. Eynon that he does not exhibit sensory differences or repetitive behaviors and that he can carry on a conversation, except he often goes off topic.  (R. 736). They related that he plays with others in the home but does not make friends with unfamiliar children due to limited environmental awareness.  (*Id.*).  His parents added that Plaintiff has daily tantrums of screaming and crying (but without aggression) when demands are placed on him or his needs are not met.  (*Id.*).  They added that when he returns home from school he has a routine of breaking up crayons, tearing paper and removing the sheets from the bed.  (*Id.*).

Upon evaluation, Plaintiff struggled to engage with the evaluator, even with prompting, but was able to explain his daily routine and narrate a "detailed, multi-step account" of how he brushes his teeth.  (R. 743).  He exhibited inconsistent eye contact and difficulty answering questions about relationships with others.  (*Id.*).  He was cooperative and comfortable and used

---

[2]  Plaintiff's IEP immediately preceding this one calculated that he would spend 85 percent of his day in a regular classroom.  (R. 545).  This IEP further directed his teachers to use enhanced encouragement, instruct on cognitive strategies, and employ multimodal strategies when teaching Plaintiff, including use manipulative aids when providing mathematics instruction and teaching writing in stages.  (R. 538-39).

both verbal and nonverbal communication, but he demonstrated "severely limited insight" into his and others' emotions. (*Id.*). Plaintiff showed spontaneity and avoided compulsive behaviors but was fidgety and slightly restless. (R. 744). He indicated his mood was "okay" but could not relate other internal feelings. (*Id.*). Dr. Eynon diagnosed autism spectrum disorder, severity level two, and recommended outpatient psychotherapy and psychoeducation and a group-based social competency program. (R. 745).

 Plaintiff returned on April 8, 2019, to Dr. Eynon for a reevaluation due to worsening behavior problems including problems following directions and climbing on furniture and people. (R. 1758-60). Plaintiff did not acknowledge the evaluator's presence and demonstrated poor eye contact and social reciprocity, but he was not aggressive and demonstrated "emerging conversational speech." (R. 1759).

On July 26, 2021, Annabel Rawlins, CCC-SLP, completed a report in which she noted that Plaintiff had received speech/articulation and language therapy since the prior December. (R. 311). She opined that he could communicate basic needs and understand and follow simple directions but not carry-on an age-appropriate conversation. (*Id.*). She calculated that despite his lisp 90 percent of his speech was intelligible, increasing to 100 percent upon repetition. (*Id.*). She diagnosed an expressive and receptive language disorder with delays in morphological completion, synonym generation, non-literal language, grammatical judgment, and pragmatics, impacting his ability to communicate with peers and understand complex directives from adults. (R. 312). Nonetheless, she rated his progress in therapy as "good" (despite attendance issues) and his prognosis as "excellent" with continued therapy. (*Id.*).

At the initial level of review, in August and November 2021, State agency consultants Monica Glazier, CCC-SLP; Donna Stroud, M.D.; and Larry Clanton, Ph.D., all found that

Plaintiff had no limitations in the domains of "moving about and manipulating objects" and "health and physical well-being" and less than marked limitations in "acquiring and using information," "attending and completing tasks," "interacting and relating with others," and "caring for yourself." (R. 62-73). On December 23, 2021, medical consultant Derek O'Brien, M.D., completed Review of Childhood Disability Evaluation Form agreeing with these findings. (R 918-19). Upon reconsideration on November 7, 2022, State agency consultant Paul Thomas Taren, Ph.D., made the same findings. (R. 76-81). In reaching these conclusions, the consultants noted Plaintiff's progress with therapy and improvement while medicated. (R. 65, 68, 77-79).

On October 13, 2021, Leslie Foulkes-Jamison, Ph.D., conducted a psychological consultative examination of Plaintiff. (R. 914-17). During the examination, Plaintiff required reminders to keep on task, spoke in a low voice and had trouble articulating. (R. 915). His eye contact was "fair at best" with limited facial expression, but he was alert with logical and coherent thought processes. (*Id.*). Dr. Jamison assessed him with below average attention span and noted that he became fidgety as the examination progressed. (*Id.*). She summarized that Plaintiff displayed many characteristics common to autistic children and recommended counseling and continued medication treatment. (*Id.*).

Plaintiff visited Rachel Simon, D.O., at the Children's Hospital of Pennsylvania (CHOP) for behavioral issues on April 8, 2022. (R. 1168). His father reported to Dr. Simon that Plaintiff's Adderall had been discontinued at the start of the year due to his becoming more emotional with spontaneous crying, but since that time he had been having trouble focusing and had been hitting his family members. (*Id.*). "When he [w]as on the medication, parents and teacher fe[lt] like it was helping his behavior." (R. 1168). It was further noted that due to a

relocation Plaintiff had stopped seeing the psychiatrist or psychologist who had been managing his ADHD and autism. (*Id.*). Dr. Simon restarted Plaintiff's Adderall and referred him to Healthy Minds Healthy Kids "for behavioral component of ADHD management." (*Id.* at 1169).

On October 26, 2022, Plaintiff was seen by Maribeth Wicoff, Ph.D., at CHOP Behavioral Health Services for his ADHD and autism spectrum disorder. (R. 1204). The chief complaint was that he had difficulty focusing and refused to follow directions. (R. 1205). However, it was further noted that Plaintiff had run out of medications six weeks earlier and that there were "no concerns when on medication." (*Id.*). Plaintiff's mental examination was largely normal, although he was "developmentally delayed" with "impaired insight." (R. 1206).

Robert Goldbach, M.D., of Kidzcare Pediatrics in Lillington, North Carolina, conducted a well exam of Plaintiff on December 13, 2022. (R. 1743). Dr. Goldbach recorded that Plaintiff was "academically successful at school without learning concerns," although he was struggling with homework. (R. 1743). Fine and gross motor skills and behavioral, neurological, and language development were all assessed as normal. (R. 1745). Plaintiff was reported to participate in "rough and tumble play," possess a "lively curiosity," be "capable of prolonged interest," have friends, and exercise independence. (*Id.*).

At a return visit on July 6, 2023, Plaintiff's medication was "working well" (despite only taking them on weekends) and his grades were described as "fair." (R. 1732). His mother had been unable to obtain applied behavioral analysis (ABA) therapy for him but wanted to retry. (*Id.*). Upon examination, Plaintiff exhibited age-appropriate social and language interaction. (*Id.* at 1733). Plaintiff was referred for ABA therapy. (R. 1734).

### C.    Non-medical Evidence

On May 25, 2021, Plaintiff's mother completed a Child Function Report for him. (R.

280-91).  She explained that he has a "hard lisp," which can make him difficult to understand, although "most of the time" he can be understood by others.  (R. 284).  She denied that Plaintiff has communications limitations, except that he cannot explain his actions.  (R. 285).  Although he has "significant trouble with learning" and requires accommodations and therapies, Plaintiff's mother noted limitations only with writing longhand, writing simple stories, and understanding money.  (R. 286).  She added that Plaintiff's fine motor difficulties make it hard or impossible for him to tie his shoes, jump rope, bicycle, roller skate, dress action figures and dolls, or use scissors, pencils, and crayons, but he can walk, run, throw a ball, swim, and play video games.  (R. 287).  Regarding his interactions with others, he gets along with adults but lacks friends his own age because he is "socially awkward" and unaware of boundaries, does not initiate conversation, ignores others, and cannot distinguish positive interactions from negative ones.  (R. 288).  His ability to care for himself is mixed.  (R. 289).  He can shower and brush his teeth, eat with utensils, help around the house (if told to), get to school on time, and accept correction.  (*Id.*).  He cannot wash or comb his hair, select clothing to wear, hang up clothing, put away toys, consistently follow direction, obey safety rules, use zippers or buttons, or tie shoelaces.  (*Id.*).  Plaintiff's lack of attention prevents him from finishing things he starts (including homework and chores) and cleaning up after himself, but he can keep himself busy and work on arts and crafts.  (R. 290).

Plaintiff's mother completed a second Child Function Report on October 15, 2022, in which she generally assessed him with greater limitations than in the prior year.  (R. 327-36).  In this report, she claimed that Plaintiff also had a stutter and that he will often not try to speak.  (R. 329).  She also downgraded his ability to verbally communicate to "some of the time," adding new limitations in delivering phone messages, telling jokes, and talking with friends.  (R. 329-

30).  Plaintiff's ability to learn remained largely the same, except he could allegedly no longer read stories or tell time.  (R. 331).  According to his mother, Plaintiff also lost the ability to brush his teeth, eat with utensils, help around the house, get to school on time, accept correction, and keep himself busy.  (R. 334-35).

At the January 19, 2024 hearing, Plaintiff's mother testified that he struggles with attention and requires constant redirection to stay on task.  (R. 44).  He takes Adderall and Brillia for his ADHD, with mixed results.  (*Id.* at 50).  The medication can cause crying spells.  (*Id.* at 54).  He can only sit for five to 10 minutes at a time due to his hyperactivity, after which point he may get up and run around the room.  (*Id.* at 51).  He is unable to sit through a 30-minute television program.  (*Id.* at 51).  He cannot be left alone at home because he may wander off or walk to school on his own because he is unsafe crossing the street.  (*Id.* at 44-45).  He does not select his own clothes to put on in the morning, and he sometimes puts his shirt on backwards. (*Id.* at 45).  He is unable to tie his shoes and has difficulty with buttons, zippers and holding a pencil and receives occupational therapy to help with his fine motor skills.  (*Id.* at 44, 49-50, 53).  Speech therapy was discontinued because it could not fix his lisp.  (R. 57).

At school, he requires extra help and modifications, including small group and one-on-one testing, pairing with a support person, and having tests and assignments read aloud to him due to his lack of concentration.  (*Id.* at 44, 48-49).  He does not complete assignments on his own and will instead become angry and withdrawn and/or have a "meltdown" two to three times per week.  (*Id.* at 44-46, 48, 51).  Most of his grades are D's.  (*Id.* at 52).  He can add and subtract but not multiply and divide.  (*Id.*).  At times he gets into trouble at school for yelling out in class, doodling on his paper or desk instead of completing assignments, leaving class without permission, getting into altercations with the other students, and, on one occasion, poking

another student with a pencil.  (*Id.* at 47-48).  Prior to moving to Philadelphia Plaintiff had

friends, but he does not currently have any.  (*Id.* at 46-47).

## III.    LEGAL STANDARD

Under the Social Security Act, the SSA must apply a three-step sequential evaluation

process to determine if a child under the age of eighteen is disabled.  20 C.F.R. § 416.924(a).  A

child under eighteen is eligible for SSI benefits only if: (1) he is not performing substantial

gainful activity; (2) he has a medically determinable impairment or combination of impairments

that is severe; and (3) the impairment or combination of impairments meets, medically equals, or

functionally equals the severity of one or more of the impairments listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  20 C.F.R. § 416.924.

If the child's impairment does not medically meet a listing, the examiner must determine

whether the impairment functionally equals a listing.  An impairment or combination of

impairments functionally equals a listed impairment if it causes a "marked" limitation in two of

six domains of functioning or an "extreme" limitation in one of those six domains.  20 C.F.R. §

416.926(a).[3]  The six domains are: (1) acquiring and using information, (2) attending and

completing tasks, (3) interacting and relating with others, (4) moving about and manipulating

objects, (5) caring for oneself, and (6) health and physical well-being.  20 C.F.R. §

416.926a(b)(1).

Judicial review of a final decision of the Commissioner is limited.  A district court is

---

[3]  A "marked" limitation "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).

bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is "more than a mere scintilla," and "such relevant evidence as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted). The Third Circuit has instructed, "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores or fails to resolve a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). The court has plenary review of legal issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

### IV.    ALJ'S DECISION

In her decision, the ALJ made the following findings:

1.    The claimant was born on August 22, 2012. Therefore, he was a school-age child on March 8, 2021, the date the application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2.    The claimant has not engaged in substantial gainful activity since March 8, 2021, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD), autism spectrum disorder, specific learning disability, and expressive and receptive language disorder (20 CFR 416.924(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925, and 416.926).

5.      The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6.      The undersigned finds that the claimant has not been disabled, as defined in the Social Security Act, since March 8, 2021, the date the application was filed (20 CFR 416.924(a)).

(R. 19-26).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 26).


V.      **DISCUSSION**

Plaintiff raises two claims in his request for review:

> (1) The ALJ's decision is not supported by substantial evidence because she failed to compare J.F. to same-aged unimpaired peers, making her functional equivalence analysis unsupportable; and

> (2) The ALJ's analysis of the domains "Acquiring and Using Information" and "Attending and Completing Tasks" is deficient because she improperly evaluated claimant's supportive services.

(Pl.'s Br., ECF No. 16, at 9-16).

A.      **Functional Equivalence**

1.      **The Parties' Positions**

Plaintiff first posits that the ALJ's functional equivalence analysis lacks the support of substantial evidence because she did not compare him to unimpaired peers of the same age. (Pl.'s Br., ECF No. 16, at 9).  He argues that such comparison is at the core of the childhood disability analysis and requires the ALJ to establish a logical bridge between the child's

functioning and that of same-aged, unimpaired children, not simply summarize the child's attributes and the record evidence. (*Id.* (citing 20 C.F.R. §§ 416.924a(b)(3), (f)(1)) (case citations omitted)). He likens this case to three within this district in which the court remanded due to the ALJ's failure to compare the claimant's functioning to same-aged peers, including *Martin o/b/o N.D.M. v. Kijakazi*, where the court found that the ALJ had inadequately considered the child's IEP. (*Id.* at 9-10 (citing No. 20-1209, 2021 WL 5987268, at *4 (E.D. Pa. Dec. 16, 2021); *Brown v. Colvin*, 193 F. Supp. 3d 460, 466-67 (E.D. Pa. 2016); *Mills-Sorrells v. Colvin*, 153 F. Supp. 3d 703, 709 (E.D. Pa. 2015))).

Plaintiff excerpts the ALJ's analysis of his ability in "acquiring and using information"[4] and contends that it lacks any logical bridge between the evidence discussed therein and the conclusion that he is at most moderately impaired in this domain, equating it instead to "receiving a grocery list and being told it is a recipe." (Pl.'s Br., ECF No. 16, at 10 (citing R. 24)). He maintains that the analysis skips multiple steps and relevant information regarding J.F.'s abilities vis-à-vis his peers, such as the IEP notation that he must be taught through "[m]ultimodal teaching strategies" in "all learning environments." (*Id.* at 10-11 (citing R. 539)). Plaintiff insists that this information is more relevant than the ALJ's observation that his IEPs

---

[4] Finding "a less than marked limitation" as to this domain, the ALJ wrote:

> The claimant has an IEP at school and uses general education and resource learning services (Exhibit 29E). In June 2022, the claimant was noted to spend eighty-five percent of the day in the regular classroom (Exhibit 26E). His most recent IEP shows a mix of special education and general education (Exhibit 28E). The claimant's most recent records show the claimant's mother reported the medication was doing well and that the claimant's grades were fair (Exhibit 17F).

(R. 24).

place him in regular classrooms for 85 percent of the day because it shows that even when he is there he must be taught in different ways than his peers due to his difficulty learning. (*Id.* (citing R. 545)). He further notes that his IEPs also require enhanced encouragement, use of redirection, that writing be taught in stages and that he be taught cognitive strategies. (*Id.* (citing R. 538, 547)). Plaintiff highlights that despite the fact that he is in sixth grade, his IEP is it at a third-grade level. (*Id.* (citing R. 554, 561)).

Next, Plaintiff sets forth the ALJ's analysis of his ability in "caring for yourself,"[5] observing that although it at least references his age it does not discuss whether the ALJ credited, either fully or partially, his mother's testimony regarding his limitations or the findings from his well visit. (*Id.* at 11-12 (citing R. 25)). He submits that it is impossible to determine from the decision what the ALJ considered to be age-appropriate self-care, how Plaintiff is deficient in that area and how those deficiencies do not constitute a "marked" limitation. (*Id.* at 12). Noting that SSR 09-7p provides that an 11-year-old should be able to independently perform most self-care and consistently avoid unsafe behaviors, he maintains that his mother's testimony that he lacks this functionality is especially probative. (*Id.*). He also points out that despite the well visit findings regarding his ability to brush his teeth and engage in play, records from other doctor visits reflected behavioral difficulties such as lack of emotional regulation, refusing to eat,

---

[5] Again finding "a less than marked limitation," the ALJ reasoned:

> The claimant's mother testified the claimant is not like a normal eleven-year-old child and cannot be left alone for safety reasons (Hearing Testimony). She alleged he cannot tie his shoes and struggles with buttons and zippers (Hearing Testimony). The claimant's well visit in December 2022 shows the claimant can brush his teeth without help, has normal fine and gross motor development and engages in active, rough and tumble play with good body control (Exhibit 17F, pg. 18).

(R. 25).

13

aggression, and hitting. (*Id.* at 12-13 (citing R.1204-06)). He maintains that these deficiencies persisted even while medicated, contrary to the ALJ's findings. (*Id.* at 13 (citing R. 24, 1168)). Plaintiff alleges that these records support his mother's testimony and implicate his deficiency in caring for himself, yet the ALJ failed to discuss how he compared to other same-aged, non-impaired children in this functional domain. (*Id.*).

Concluding his opening brief on this claim, Plaintiff insists that he is not asking the Court to reweigh the evidence, but to require the ALJ to perform the mandated comparative analysis. (*Id.*). He contends that her decision as currently formulated can only be upheld via an inappropriate "post hoc cleanup." (*Id.*).

After summarizing the background law and the ALJ's decision, the Commissioner counters that the ALJ's discussion of the evidence reflects that none of Plaintiff's limitations were even close in severity to the examples of functional equivalence set forth in the regulations, such as a complete inability to function outside the home at an age-appropriate level or the need for round-the-clock supervision. (Resp., ECF No. 17, at 6 (citing 20 C.F.R. § 416.926a(m))). The Commissioner highlights that a speech-language pathologist found Plaintiff's speech had improved to match his mental age and that the ALJ noted that the pathologist determined his speech to be 90 percent intelligible. (*Id.* (citing R. 24, 311-12)). Additionally, the Commissioner maintains that the ALJ's reasoning is "easily traced" given that every medical expert who rendered an opinion during the period under review determined that Plaintiff had no marked or extreme limitation in any domain, such opinions are accorded "significant consideration" under the regulations, and here the ALJ found them all persuasive. (*Id.* at 6-7 (citing R. 62-73, 78-79, 918-19; 20 C.F.R. § 416.913a(b)(1); quoting *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011))). Addressing the experts' reasons for assessing a

less than marked limitation in "acquiring and using information" and "attending and completing tasks," in particular, the Commissioner notes that they relied upon Plaintiff's scores in full-scale IQ, visual spatial index, fluid reasoning index, working memory index, and processing speed index, which mere mostly in the below average to average range.  (*Id.* (citing R. 67, 497)).  Moreover, the Commissioner contends that the ALJ's discussion of his IEPs necessarily compared his functional ability to that of same-aged peers without impairments because they set forth special accommodations provided only to him.  (*Id.* at 7-8 (citing R. 24-25)).

Plaintiff replies that the Commissioner's examples of marked and extreme limitations (such as a total inability to function at an age-appropriate level outside the home or the need for 24-hour supervision) inaccurately depict what it takes to establish functional equivalency.  (Reply, ECF No. 18, at 2 (citing Resp., ECF No. 17, at 6)).  Highlighting that the regulations themselves note that these are merely examples, he lists the examples for "acquiring and using information"[6] and posits that these show that the Commissioner's proposed standard does not comport with what the law requires.  (*Id.* (citing 20 C.F.R. § 416.926a(g)(3))).  He observes that the Commissioner's cited examples would eliminate the need to compare the claimant with other

---

[6]  These examples include:

> (i) You do not demonstrate understanding of words about space, size, or time; e.g., in/under, big/little, morning/night.
> (ii) You cannot rhyme words or the sounds in words.
> (iii) You have difficulty recalling important things you learned in school yesterday.
> (iv) You have difficulty solving mathematics questions or computing arithmetic answers.
> (v) You talk only in short, simple sentences and have difficulty explaining what you mean.

20 C.F.R. § 416.926a(g)(3).

children because a child's limitations are obvious when he or she cannot function outside the home or requires nonstop supervision. (*Id.* at 2-3).

Turning to the Commissioner's argument that the ALJ compared Plaintiff to same-aged unimpaired peers when she addressed his IEP, Plaintiff maintains that it misunderstands the nature and function of IEPs and suffers from similar deficiencies as the Commissioner's contention that Plaintiff's grades and promotion to the next grade level in school each year shows that he is functioning near his age level. (*Id.* at 3 (citing Resp., ECF No. 17, at 6-8)). He emphasizes that IEPs are individualized and that the Supreme Court's description of them based on the underlying statute does not reference other, same-aged children without impairments. (*Id.* (citing 20 U.S.C. § 1412(a)(1); *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017))). He adds that children with IEPs are evaluated relative to the specific goals set forth therein rather than compared to other children, which helps to explain why he performs below grade level on standardized tests notwithstanding his fair grades. (*Id.* at 3-4 (citing R. 66, 264)).

In closing, Plaintiff disputes that he seeks a reweighing of the evidence, insisting instead that he asks only for the required comparison of his functioning to that of other, same-aged unimpaired children. (*Id.* at 4). He analogizes the ALJ's decision to a student who attempts to submit a final answer without showing his or her work. (*Id.*). He contends that without the necessary comparative analysis the ALJ's decision is unreviewable. (*Id.*).

### 2.    Analysis

To evaluate a child for disability, the Commissioner secures information from sources who can elaborate on his or her impairments and functioning. 20 C.F.R. § 416.926a(b)(3). These can include medical sources, parents, teachers and others who see a child often and can describe his or her functioning at home, in childcare, at school, or in the community. *Id.* §

416.926a(b)(3).  The Commissioner then takes this information and compares the child to the typical functioning child of the same age who does not have impairments. *Id.* §§ 416.924a(a), 416.926a(f)(1); *see also* SSR 09-1p (laying out the "Whole Child" approach to childhood disability analysis).  In making this comparison, the Commissioner looks to whether a child is doing the same things that other children his or her age typically do or whether limitations exist in performing such activities because of the child's medically determinable impairment(s).  20 C.F.R. § 416.924a(b)(3)(i).

In addition, the Commissioner must evaluate how well a child can "initiate, sustain, and complete" activities.  20 C.F.R. § 416.924a(b)(5)(i).  The Commissioner also accounts for extra help needed from other people, special equipment, adaptive devices, medications or structured supportive settings.  *Id.* § 416.926a(b)(5)(ii)-(iv).  Evidence from the child's school, such as teacher's comments, early intervention and special education programs, accommodations, and attendance and participation, are all considered in determining how a child compares to other, non-impaired children of the same age.  *Id.* § 416.924a(b)(7).

Here, Plaintiff maintains that the ALJ's purported failure to compare him to his same-aged peers manifested itself, in particular, in her evaluation of his abilities in "acquiring and using information" and in "caring for yourself."  (Pl.'s Br., ECF No. 16, at 10-13).  Regarding the former domain, he posits that the ALJ established no "logical bridge" between the cited evidence and the finding of less than marked limitations because despite pointing out that he spends 85 percent of his school day in a regular classroom, she did not acknowledge the specific accommodations he receives across "all learning environments" that establish that he was treated differently than other students, even while receiving general education.  (*Id.* at 10-11).  However, in concluding that Plaintiff had at most only a moderate limitation in this area, the ALJ

highlighted his receipt of "resource learning services" and "mix of special education and general education" through his IEP (in addition to his success with medication and unremarkable grades). (R. 24). Contrary to Plaintiff's contentions, this analysis of the evidence, even without the ALJ parsing each individual service received by Plaintiff, allows the Court to trace how she settled upon his "less than marked" limitation in this area and therefore satisfies the reasonable articulation standard. *See Amanda L. v. Bisignano*, No. 24-08488, 2025 WL 1885962, at *5 (D.N.J. July 8, 2025).

Turning to the ALJ's similar finding regarding his ability to care for himself, Plaintiff submits that it is impossible to determine from the decision whether the ALJ credited his mother's testimony regarding his limitations or rather the findings from his well visit showing greater functionality, what the ALJ viewed as age-appropriate self-care, or how Plaintiff's deficiencies in this domain did not establish a "marked" limitation. (Pl.'s Br., ECF No. 16, at 11-12). He claims that his mother's testimony that he cannot perform age-level self-care is "particularly probative" in light of SSR 09-7p, points to other treatment notes tending to conflict with those from the referenced well visit and insists that the difficulties reflected therein persisted even while medicated, contrary to the ALJ's findings. (*Id.* at 12-13). Undoubtedly, Plaintiff's mother's testimony that he cannot care for himself like a normal child of his age, and specifically that he cannot be left alone due to safety reasons, is relevant information. *See* SSR 09-7p, at *5 (noting that school-aged children like Plaintiff can typically "avoid[ ] behaviors that are unsafe"). However, the ALJ (and not this Court) is tasked with weighing such information against other relevant evidence in the record, including the December 2022 well visit notes showing that Plaintiff brushes his teeth without help, exhibits normal fine and gross motor development, and actively engages in rough and tumble play with good body control. (R. 25);

*see Williams*, 970 F.2d at 1182 (the court does not reweigh the evidence or substitute its findings for the ALJ's). The ALJ's determination that Plaintiff did not have a marked limitation in caring for himself demonstrates that she credited Plaintiff's well visit records over his mother's testimony in this instance, as was her prerogative. Furthermore, the ALJ was not required to recite examples of appropriate self-care for Plaintiff's age group when these are already laid out in SSR 09-7p, and in any event her highlighting of Plaintiff's ability to engage in activities like brushing his teeth without assistance comported with this ruling. (R. 25); *see* SSR 09-7p at *5 (giving as an example of appropriate self-care for a six- to twelve-year-old: "[p]erforms most daily activities independently (for example, dressing, bathing)," even if the child may require reminders).

Additionally, Plaintiff contends that the ALJ's analysis of this domain was deficient because she misstated that he had behavioral issues only when unmedicated, (Pl.'s Br., ECF No. 16, at 13 (citing R. 24, 1168)), but it is Plaintiff who is mistaken. In fact, what the ALJ actually stated is that he "has not had any complaints other than medication management *since being seen in December 2022 and again in July 2023*." (R. 25 (emphasis added)). The record cited by Plaintiff dates to April 2022.[7] (R. 1168). The more recent records relied upon by the ALJ explicitly confirm that by 2023 his medication was "working well." (R. 1732). Moreover, they reflect him being "academically successful at school without learning concerns;" exhibiting

---

[7] Plaintiff characterizes the treatment note from his April 2022 visit showing that "different behavioral issues are present depending on the presence, absence, and specific dosage of medication." (R. 1168). Specifically, this record indicates that in January 2022, while taking an increased dose of Adderall, Plaintiff was not eating regularly and became unusually emotional and prone to crying, leading to discontinuance of the drug. (*Id.*). However, he then turned more aggressive and started to hit family members, and his focusing issues returned. (*Id.*) His parents and teacher reported that "[w]hen he was on the medication, . . . it was *helping* his behavior." (*Id.* (emphasis added)). Thus, the former expressed an interest in restarting him on it, albeit at a lower dosage. (*Id.*).

prolonged concentration and normal fine and gross motor skills and social, behavioral, neurological, and language development; retaining friends; and exercising independence.  (R. 1733, 1743, 1745).  Thus, the Court finds nothing in the ALJ's evaluation of Plaintiff's ability in "caring for yourself" to warrant remand.

Plaintiff's next argument in support of his first claim is that the ALJ failed to compare him to same-aged peers without impairments, as mandated by the regulations.  (Pl.'s Br., ECF No. 16, at 9 (citing 20 C.F.R. 416.924a(b)(3), (f)(1))).  However, as the Commissioner observes, the ALJ necessarily compared his functional abilities to those of unimpaired, same-aged peers when she addressed his IEPs, which set forth accommodations provided to Plaintiff but not to his fellow students.[8]  (Resp., ECF No. 17, at 7-8 (citing R. 24-25)).  Indeed, the ALJ specifically referenced Plaintiff's IEPs[9] in her consideration of four of the six relevant domains, highlighting during that analysis that the IEPs provide for 15 percent of the day in special education classes apart from the main student body, as well as resources learning services and "accommodations that help the claimant with focusing."  (R. 24-25).  These services and accommodations included social skill development, extra breaks, use of an assignment checklist, reduction of assignments to 60 percent of that required from Plaintiff's peers, repeated directions, and testing in a separate room, one-on-one, and/or orally.  (R. 547-51).  The ALJ also compared Plaintiff to his same-aged unimpaired peers when she pointed out that he has been advanced alongside them to the next grade level each year in school, that his grades were within acceptable limits, that although

---

[8]  This fact distinguishes this case from *Mills-Sorrells*, cited by Plaintiff, where the ALJ "accurately recited the applicable standards . . . [b]ut . . . did not compare [the claimant's] functioning to that of a same-aged child . . . ."  153 F. Supp. 3d at 709.

[9]  Additionally, the ALJ noted that Plaintiff's medical records showed that his IEPs, along with his medication, rendered his autism and ADHD "well controlled."  (R. 25).

he has social difficulties he maintained friendships before moving away, that he has "normal" motor development, and that he is able to participate in "active, rough and tumble play." (R. 24-25).

Plaintiff disputes that the ALJ's conclusions derived from review of his IEPs and performance in school under them involved a comparison with others because IEPs are, by definition, "individualized," and children with IEPs are evaluated according to the goals set forth therein rather than vis-à-vis their unimpaired peers. (Reply, ECF No. 18, at 3 (citing 20 U.S.C. § 1412(a)(1); *Endrew F.*, 137 S. Ct. at 994)). Per Plaintiff, this latter fact explains why despite his adequate grades he performed below grade level on standardized tests. (*Id.* at 3-4). But Plaintiff conflates the school's evaluation of a student's progress against his IEP with the ALJ's comparison of the child's functionality with that of same-aged children without impairments for purposes of determining disability. It is true that the former is concerned with the student's advancement toward "'measurable annual goals, including academic and functional goals,' along with a 'description of how the child's progress toward meeting' those goals will be gauged." *See Endrew F.*, 137 S. Ct. at 994 ("The IEP must also describe the 'special education and related services . . . that will be provided' so that the child may 'advance appropriately toward attaining the annual goals[.]'") (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV)). However, the inherently individualized nature of IEPs for educational purposes does not mean that an ALJ evaluating functional equivalence cannot also perform the required comparison with reference to the child's IEPs, as occurred here.

Indeed, Plaintiff likens this case to *Martin*, in which Magistrate Judge Richard Lloret "found that the ALJ had inadequately considered the child's IEP," (Pl.'s Br., ECF No. 16, at 9-10 (citations omitted)), underscoring the point that analysis of a child claimant's IEP (where one

exists) is a required part of an ALJ's disability review. *See also Martin*, 2021 WL 5987268, at *4 ("Under Social Security regulations, the ALJ must consider the information in a minor claimant's IEP when determining her level of functioning.") (citing 20 C.F.R. § 416.924a(b)(7)(iii)). Nonetheless, Plaintiff maintains that the ALJ's analysis of his IEPs and the "degree to which [his] improvements occurred within a structured educational setting" was lacking pursuant to *Martin*. (Pl.'s Br., ECF No. 16, at 9-10 (quoting 2021 WL 5987268, at *4)). But *Martin* is distinguishable on these points. In that case, the ALJ ignored the claimant's declining grades in multiple classes throughout the school year, poor results on standardized testing and five-grade disparity between his nominal grade (sixth) and reading level grade (first). 2021 WL 5987268, at *4. Here, by contrast, Plaintiff's grades appear to have been stable, the standardized testing flagged in his opening brief showed cognitive abilities at least on the cusp of the average range and the disparity between his stated and real grade level was less than in *Martin*.[10] (*See* R. 1732 (most recent July 2023 medical record indicating that Plaintiff continued to earn "fair" grades), 234 (standardized cognitive testing assessed Plaintiff within or near the "low average" range of intellectual abilities), 561 (noting three-grade-level difference between his professed and "overall" grade)). Moreover, in *Martin*, evidence disregarded by the ALJ "suggest[ed] a discrepancy between [the child's] behavior inside and outside her special

---

[10] Notably, the ALJ did not find on these facts that Plaintiff had no limitations (except in two functional domains not at issue here), only that he had "less than marked" limitations. (R. 24-25). Judge Lloret found that the evidence before him was "highly relevant" and even "powerful" in suggesting that Martin had a marked limitation in one domain (acquiring and using information), but that does not mean that on the different evidence before this ALJ she could not have reasonably determined that Plaintiff had only non-marked limitations. *See Simmonds*, 807 F.2d at 58 (the decision of the ALJ will not be overruled as long as there is substantial evidence to support it).

education classes" and that her "improvement might only be occurring when she is supported in a structured setting." *Id.* at 6.  Plaintiff points to no such overlooked evidence here.[11]

For the foregoing reasons,[12] the Court denies Plaintiff's first claim.

### B.    Plaintiff's Supportive Services

#### 1.    The Parties' Positions

In his second claim, Plaintiff alleges that in analyzing the "acquiring and using information" and "attending and completing tasks" domains the ALJ improperly evaluated his supportive services.  (Pl.'s Br., ECF No. 16, at 13).  He observes that an ALJ must consider, *inter alia*, the impact of a child's support services in a structured setting (such as an IEP), how much assistance he or she receives, and how he or she would function without it.  (*Id.* (citing 20 C.F.R. § 416.924a(b)(iv)(E))).  He notes that simply listing what services the claimant receives, along with his or her grades, does not suffice.  (*Id.* at 13-14 (citing *A.B. on behalf of Y.F. v. Colvin*, 166 F. Supp. 3d 512, 520 (D.N.J. 2016); *Cruz v. Comm'r of Soc. Sec.*, No. 08-3721, 2009 WL 2448517, at *10 (D.N.J. Aug. 10, 2009))).

---

[11] Plaintiff's citation to *Brown* is even more off-base.  He notes that the ALJ in that case remanded in part because the child had been cooperative and engaged during therapy without considering how he would have behaved in a nontherapeutic setting compared to unimpaired children of his age, (Pl.'s Br., ECF No. 16, at 9 (citing *Brown*, 193 F. Supp. 3d at 466-67)), but in assessing the six domains of Plaintiff's functioning the ALJ in this matter relied on no therapy records.  (R. 24-25).

[12] In his reply, Plaintiff also disputes that the Commissioner's proffered examples of marked and extreme limitations accurately depict the standard for determining functional equivalency.  (Reply, ECF No. 18, at 2 (citing Resp., ECF No. 17, at 6)).  Because the examples cited by the Commissioner played no role in the Court's resolution of this claim, it does not address Plaintiff's counterarguments on this point.

Plaintiff suggests that the ALJ's treatment of his ability to "acquire and use information,"[13] in particular, contains similar mistakes to those made by the ALJ in *K.K. on behalf of K.S. v. Commissioner of Social Security*, No. CV 17-2309, 2019 WL 1509091, at *7 (D.N.J. Mar. 27, 2018), where the court remanded an ALJ decision based on a "superficial" analysis of the claimant's improved grades and increased participation in general education classes that failed to consider how continued special education support may have aided in that progression or how the claimant might perform in an unstructured setting. (*Id.* at 14). Pointing to the ALJ's reliance on his percentage of time spent in a regular classroom and his receipt of both special and general education, Plaintiff insists that such shallow consideration is precisely what cases like *K.K.* (and *A.B.* and *Cruz*) warn against. (*Id.* (citing R. 24)). He underscores that despite spending 85 percent of his day in a regular classroom, the 15 percent that he receives special education is designed to support him in every other aspect of academic performance, including reading comprehension, which according to his IEPs must be improved "*for him to access the general education curriculum*." (*Id.* at 14-15 (citing R. 561) (emphasis added by Plaintiff)). He observes that notwithstanding this fact the ALJ failed to evaluate how he might perform without this support and that doing so could have helped her to resolve the apparent

---

[13] The ALJ determined that Plaintiff has non-marked limitation as to this domain because:

> The claimant has an IEP at school and uses general education and resource learning services (Exhibit 29E). In June 2022, the claimant was noted to spend eighty-five percent of the day in the regular classroom (Exhibit 26E). His most recent IEP shows a mix of special education and general education (Exhibit 28E). The claimant's most recent records show the claimant's mother reported the medication was doing well and that the claimant's grades were fair (Exhibit 17F).

(R. 24).

discrepancy between his "fair" grades and the IEP's assessment that he had second- and third-grade math and reading skills, respectively.  (*Id.* at 15 (citing R. 25, 561)).

Turning to the ALJ's finding that he had a "less than marked" limitation in "attending and completing tasks,"[14] Plaintiff again asserts that her focus on his fair grades, advancement through each grade level without being held back, and IEP accommodations is prohibited by the case law because it ignores that he is provided additional in-classroom modifications, such as extra time on tests, testing in small groups, and changes in how materials are taught.  (*Id.* at 16 (R. 555-71)).  In particular, he emphasizes that even if his medication improves his concentration (as the ALJ noted), his IEPs nonetheless make clear that "he requires frequent redirection and prompting to complete tasks."  (*Id.* (citing R. 558)).  He continues that the decision includes no discussion regarding the extent to which his achievement in school results from the accommodations he receives in the regular classroom, in addition to special education, and that even with this assistance he may "shut down" if he becomes frustrated.  (*Id.* (citing R. 448)).  Lastly, he concludes that the ALJ's errors render her decision unreviewable.  (*Id.*).

The Commissioner responds that the ALJ observed based on the evidence that Plaintiff was mostly enrolled in general education classes (where he obtained "fair" grades), that he had

---

[14]  For this domain, the ALJ explained:

> The claimant has a diagnosis of ADHD but has reported his medications work well in controlling his symptoms (Exhibit 17F). The claimant has had some difficulty focusing but has done well since his last medication adjustment (Exhibit 15F and 17F). The claimant's grades are fair, and his IEP has accommodations that help the claimant with focusing (Exhibits 28E and 29E). The claimant's mother alleged the claimant requires only one step instructions, but as noted above, the claimant's mother also reported the claimant's grades were fair and the claimant has not been held back in any grades (Exhibits 28E and 29E).

(R. 24-25).

never been held back, that his medication largely controlled his ADHD symptoms, and that he was considered a "high functioning" autistic child.  (Resp., ECF No. 17, at 6 (citing R. 24, 543, 1732, 1738)).  The Commissioner next highlights the ALJ's discussion of the support services provided for in Plaintiff's IEP, including additional time and small group settings for tests and assignment of a peer buddy for independent work time and unfamiliar work transitions.  (*Id.* at 8 (citing R. 24)).  According to the Commissioner, the relevant question is not whether the ALJ should have further explained the extent to which Plaintiff's success in school depended upon this structured environment (as framed by Plaintiff), but whether it "came anywhere close" to the regulations' examples for impairments functionally equaling the listings, like a complete inability to function outside the home within norms appropriate to the claimant's age.  (*Id.* (citing 20 C.F.R. § 416.926a(m))).  The Commissioner answers this latter question in the negative, insisting that the record coupled with the ALJ's discussion of the persuasive medical findings suffices to allow this Court to trace her reasoning as to how Plaintiff's support services did not come near the level of severity required by the regulations.  (*Id.*).  In closing, the Commissioner argues that Plaintiff seeks a more granular analysis than required by the reasonable articulation standard and, at bottom, simply asks this Court to reweigh the evidence and decide in his favor.  (*Id.* at 8-10 (citing *Zaborowski v. Comm'r of Soc. Sec.*, 115 F.4th 637, 639 (3d Cir. 2024); *Jones v. Barnhart*, 364 F.3d 501, 504-05 (3d Cir. 2004); *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Phillips v. Barnhart*, 91 F. App'x 775, 780 n.7 (3d Cir. 2004); *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981)) (additional citations omitted)).

In reply, Plaintiff reiterates that the ALJ must consider the impact support services in a structured setting have on the child's performance, as well as how the child would function without them.  (Reply, ECF No. 18, at 4 (citing 20 C.F.R. § 416.924a(b)(5)(iv)(E); *K.K.*, 2018

WL 1509091, at *7)).  He also accuses the Commissioner of relying on the idea that the regulations define functional equivalence as nearing a complete inability to function to deflect from the ALJ's failure to properly evaluate how Plaintiff's support services have improved his functioning.  (*Id.* at 4-5 (citing Resp., ECF No. 17, at 8)).  He further accuses both of ignoring the fact that his extra supports – including additional time for tests, small group testing and different teaching methods – extend to the classroom itself.  (*Id.* at 5 (citing R. 555-71)).  He acknowledges that the ALJ noted some of his support services, but he maintains that she failed to analyze how they have affected his performance and how he would perform without them.  (*Id.*).

### 2.    Analysis

20 C.F.R. § 416.924a(b)(5) requires the ALJ to consider "the amount of help or adaptations" a minor claimant needs and "the effects of structured or supportive settings" when evaluating how well he or she can carry out activities.  Regarding the latter, even if the claimant is functioning adequately in the special setting, the ALJ must consider whether he or she would continue to do so in a less supportive environment.  20 C.F.R. § 416.924a(b)(5)(C); *see also* § 416.924a(b)(5)(E) ("if your symptoms or signs are controlled or reduced in a structured setting, we will consider[, *inter alia*,] *how you would function without the structured or supportive setting*") (emphasis added).

Here, the matter must be remanded because no indication exists that the ALJ considered how Plaintiff would function if he no longer received special education.  (*See* R. 24-25).  The Commissioner argues that the ALJ "discussed" the support services provided under Plaintiff's IEP and highlighted his seemingly adequate academic performance while receiving them, the positive effects of his medication and his "high functioning" status despite his autism, (Resp., ECF No. 17, at 6, 8 (citing R. 24, 543, 1732, 1738)), but none of this serves as a substitute for the

analysis required by the regulations, i.e., consideration of whether Plaintiff would have continued to function at this level if he was placed in a setting without these extra supports. Similarly, the Commissioner attempts to reframe the relevant question as whether Plaintiff "came anywhere close" to the examples of functional equivalence set forth in 20 C.F.R. § 416.926a(m), (*id.* at 8), but nothing in the regulations allows the ALJ to skip the required evaluation because, in the Commissioner's view, the ultimate disability determination would have been the same.[15]

As Plaintiff notes, this case shares similarities with *K.K.*, 2019 WL 1509091, in which Chief Judge Jose Linares of the District of New Jersey held inadequate the ALJ's consideration of how "K.S.'s [the claimant's] continued special education support might be a factor in her progression, nor d[id] he assess how K.S. might perform outside of a structured setting." *Id.* at *7. The court dismissed as "superficial" and "not sufficient" the ALJ's discussion of the claimant's good grades in school because he did "not evaluate how her structured setting might be affecting her grades beyond highlighting that K.S. receives 'special education in about forty percent of her classes.'" *Id.* (citations omitted). Here, the ALJ likewise noted Plaintiff's "fair" grades and the percentage of his school day spent in regular and special education classes, but no indication exists that he ever considered how his extra support may have contributed to his academic performance or what his functioning might look like without it. (R. 24-25); *see K.K.*, 2019 WL 1509091, at *7 ("ALJ O'Leary's findings in his six-category functional equivalence analysis are thus unsupported by substantial evidence, because he failed to consider how K.S. would function outside her structured setting and how her structured setting contributed to her

---

[15] Indeed, impairments establishing childhood disability "are not limited to the examples in this paragraph, because these examples do not describe all possible effects of impairments that might be found to functionally equal the listings." 20 C.F.R. § 416.926a(m). This fact undermines the Commissioner's suggestion that the analysis set forth by the regulations is only required if the claimant comes "close" to an example specified in § 416.926(m).

improvement"); *see also A.B.*, 166 F. Supp. 3d at 520 (remanding where the ALJ failed to consider, *inter alia*, "the limitations in functioning [the claimant] exhibits despite his placement in a sheltered environment, and how he would function if he did not have these support services").

Accordingly, the Court remands this matter for further consideration of Plaintiff's supportive services pursuant to 20 C.F.R. § 416.924a.

## VI.    CONCLUSION

For the reasons set forth above, Plaintiff's Request for Review is **GRANTED**.  This matter is remanded for further proceedings consistent with this memorandum.

BY THE COURT:

    /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge